Myrtle L. SCOTT, Respondent,

v.

CLUB EXCHANGE CORPORATION, Attorney in Fact for the Automobile Inter Insurance Exchange, Appellant.

No. 28738.

Missouri Court of Appeals, Kansas City District.

Dec. 5, 1977.

Motion for Rehearing and/or Transfer Denied Dec. 27, 1977.

Application to Transfer Denied Feb. 8, 1978.

doctrine is available to plaintiff in the unusual circumstances of this case; and, if so, whether her action fails for failure to comply with notice provisions of her policy. Affirmed.

█ The doctrine applies when the occurrence resulting in injury was such as does not ordinarily happen if those[1] in charge use due care, the instrumentalities[2] involved were under the management and control of the defendant, and the defendant possesses superior knowledge or means of information as to the cause of the occurrence. *Furlong v. Stokes*, 427 S.W.2d 513, 517[2] (Mo.1968).

Appellant contends that plaintiff was not entitled to submit her case under the res ipsa loquitur doctrine, asserting: that there has been no showing that the occurrence resulting in injury was such as does not ordinarily happen if those in charge use due care; that the case is not one in which the instrumentalities involved were under the management and control of defendant; that defendant does not possess superior knowledge or means of information as to the cause of the occurrence; and that plaintiff failed to prove lack of contributory negligence on the part of her decedent.

On January 2, 1973, Raymond E. Scott, age 57, in good health, was living at 5056 Tarkio Northeast, Kansas City, Clay County, Missouri, with Myrtle L. Scott to whom he had been married for 32 years. Mr. Scott was a superintendent for Garney Construction Company on a waterline job in Rulo, Nebraska. He had been on that job for three or four months during which he would be away from home during the week and at home weekends. On January 2, 1973, he arose at his home around 3:00 A.M., had his breakfast, and left the house at approximately 4:00 A.M. His normal route to Rulo was by way of northbound Interstate 29. Mrs. Scott did not go back to sleep and heard of an accident on I-29. "I didn't know it was him. Then I got a call shortly after from the hospital * * * to

Max Von Erdmannsdorff, Von Erdmannsdorff, Zimmerman, Gunn & Trimble, Kansas City, for appellant.

Snowden, Crain & DeCuyper, Joseph Y. DeCuyper, Hsiang-Lin Lee, Kansas City, for respondent.

Before SHANGLER, P. J., and WELBORN and HIGGINS, Special Judges.

ANDREW JACKSON HIGGINS, Special Judge.

Appeal from judgment for Myrtle L. Scott in action under uninsured motorist coverage for damages for death of her husband sustained when his automobile, northbound on Interstate 29, came into collision with the wreckage in his right of way of an automobile theretofore also operated northbound on I-29 by one Jessie Virginia Malcolm who perished in the wreckage of her vehicle prior to the Scott collision. The questions are whether the res ipsa loquitur

1, 2. These matters are also expressed in the singular. See West's Missouri Digest, Negligence 121.2(3).

go where his car was, and I went there, and then directly from there to the hospital."

John Blankenship, an over-the-road truck driver of 10 years' experience and a driver for Consolidated Freightways, left its terminal in Kansas City, Missouri, around 3:30 A.M., January 2, 1973, driving a two-trailer and tractor rig on a regular run to North Platte, Nebraska. His route also was by way of northbound I-29, and at approximately three-tenths of a mile north of the 92 spur on I-29 near Platte City, Missouri, he came upon a vehicular accident. At that location, "you kind of go around the corner there to the right, and kinda on an uphill grade, kind of in a blind spot in the road is what I would call it, * * * you can't get a clear vision of what's on down the road ahead of you there until you get a little higher. * * * it seems to me like where the accident happened was * * * like you'd be driving up the road and you'd get a clear vision of what was ahead of you you'd be on top of the accident." Mr. Blankenship's first knowledge of the casualty "was a Yellow Transit truck ahead of me * * * he had a pretty hard time getting stopped and I think he ended up more in the left lane than he did in the right lane * * * kind of stopped at an angle * * like he was kind of undecided whether he was going to get stopped or not." Mr. Blankenship went up to the first vehicle "which was the Scott vehicle, and the man was sitting in there behind the wheel * * the other car * * * was laying there upside down in the highway and the top was all smashed down on it * * * I walked around to the north side of the car and I seen this lady's * * * arm sticking out from underneath the top of the car." He did not see any lights on the lady's car, and did not recall any headlights burning on the Scott car. "[H]is taillights might have been on * * * the lady's car was laying upside down facing the west and the Scott vehicle was still facing northbound about in the driving lane or maybe just a little bit to center of it * * * she was pretty much in the driving lane * * she pretty well had the highway * * * blocked." The radiator was steaming on

the Scott car. He did not see the lady; he detected no odor of alcohol on the man. "[I]t looked to me like that she had ran off the road and ran into one of those highway signs * * * she had one of these big highway signs completely wrapped around the front of her car where she had ran over it." Her car was "just smashed flat on top * * * and then where * * * he ran into the side of her was buggered up." He talked with Mr. Scott. "He just said he came upon it and there it was, said he didn't have time to do anything hardly." He observed where "she ran off the road and hit the sign and came back on the highway * * * upside down." He "wouldn't want to be driving down the highway at the speed limit and just run up there and try to get around * * * if you was already stopped and you already knew * * * that you had room enough to get around you might try it, but if I was coming down the road in that truck and I ran up on this accident I sure wouldn't * * try to drive around it. * * * I would have tried to have gotten stopped, but * * you just can't run upon something and just run off the road."

Trooper James Dale Morrison of the Missouri State Highway Patrol was about 20 miles south of the casualty scene when he received a call to investigate. He fixed the time of the casualty at 4:35 A.M. The casualty occurred in the northbound lane of I-29, approximately three-tenths of a mile north of 92 spur overpass. I-29 at the scene is a four-lane highway with two northbound and two southbound lanes separated by a median. The traveled portion of the northbound lanes is 23 feet wide. There is a 6-foot shoulder on the west or median side and a 10-foot shoulder on the east or ditch side. He observed "one car upside down pointing toward the west, this was in the driving lanes of 29, the second vehicle a few feet south of that car on its wheels." The latter was headed generally northeast, and its driver identified himself as Raymond Edward Scott. "I wrote down his estimated speed at 70, and his injuries, he complained of chest injuries and he told me he

was wearing a 'lap belt.'" Mr. Scott was lucid and alert and made some statements about the occurrence but the trooper did not write them down and could not recall them. The other driver, Mrs. Malcolm, "had partial ejection out of the driver's window and the car was resting on her head and neck." She had already expired. With respect to the path of Mrs. Malcolm's car south of the scene, "there were tire tracks leaving the driving lane, or the right hand lane, on the right shoulder. The tire tracks were visible for 153 feet. There the vehicle apparently struck a highway sign * * * the tracks continued, the left wheels were on the shoulder, and the right wheels were on the dirt edge of the shoulder. There was an indentation in the dirt embankment where car one [Malcolm] had apparently struck this embankment causing it to overturn on its top * * * there were metallic marks on the pavement * * * from the top of the car when it overturned, and pieces of driver number one's body was found in this area, along with the skid marks." The Malcolm car traveled 85 feet after striking the sign and up to the embankment, after which there were the metallic scuff marks and blood in a trail 96 feet northwest from the embankment to where the car "stopped or was struck by number two [Scott]" when number one was crosswise or upside down in northbound I-29. One hundred one feet of skid marks leading southward from the Scott vehicle also ended there, and such point of impact was marked with glass and pieces of chrome from the grill of the Scott car. At that point Mrs. Malcolm's vehicle "kind of spun in a counter-clockwise direction, it was knocked for an additional forty-seven feet." The Scott vehicle, a 1969 Ford two-door, was damaged across its front end which was not pushed up to the driver's seat, i. e., "not that much force." The Malcolm vehicle, a 1967 Chevrolet two-door, was demolished. "The top of the car was caved in." Trooper Morrison estimated the speed of both vehicles to have been at 70 miles per hour. He did not detect any odor of alcohol on either driver, and stated the speed limit as 70 miles per hour.

Mr. Scott was taken by ambulance to Spelman Hospital in Smithville, Missouri, where he was found to be in acute distress. He continued downhill and died January 6, 1973, of "shock lung syndrome, rib fractures, pneumothorax and * * *" as a result of injuries sustained in the accident.

Defendant stood on a motion for directed verdict at the end of plaintiff's case. Plaintiff's case was submitted as a res ipsa loquitur case in the form of MAI 31.02(1). Defendant offered, and the court refused, instructions which would direct a verdict for defendant if the jury found that Raymond E. Scott was negligent in some particular which caused or contributed to cause Mr. Scott's death. Appellant does not question the form of plaintiff's verdict-directing instruction, nor is there any error charged to the refusal of defendant's offered instructions.

In these facts and circumstances, the court did not err in permitting plaintiff to submit her case under the res ipsa loquitur doctrine.

Although there is no presumption of liability to be drawn from the fact of an accident and resultant injury, *Clymer v. Tennison*, 384 S.W.2d 829, 834 (Mo.App. 1964), the character of the accident, rather than the fact of the accident, determines whether the res ipsa loquitur doctrine applies, *Harke v. Haase*, 335 Mo. 1104, 75 S.W.2d 1001, 1003 (1934). A plaintiff to come within the doctrine need not show such a state of facts surrounding the accident as excludes every reasonable hypothesis except defendant's negligence; the attendant facts must raise a reasonable inference of defendant's negligence but they need not exclude every other inference. *Maxie v. Gulf, M. & O. R. Co.*, 358 Mo. 1100, 219 S.W.2d 322, 325 (1949). Loss of control or failure to control the movement of a motor vehicle so that it leaves the highway and causes injury permits an inference of negligence on the part of the driver; and so long as the plaintiff's evidence does not show the cause of the casualty, or if the true cause is left in doubt, plaintiff is not

deprived of the right to invoke the res ipsa loquitur doctrine. *Collins v. Nelson,* 410 S.W.2d 570, 573 (Mo.App.1965). The inference of negligence is from the operation of the automobile in such manner and lack of control that it leaves the proper part of the highway safe for travel and encounters or creates dangers to persons whether such persons are occupying the automobile or are near or along the highway, and such inference is not dependent upon whether the person injured as a direct result thereof is in the automobile or in its pathway. *Tabler v. Perry,* 337 Mo. 154, 85 S.W.2d 471, 477 (1935).

▇ The evidence tends to prove that while Mrs. Malcolm was driving her automobile, she operated it in such manner and lack of control that, for reasons known only to her, it left the traveled portion of the highway, returned to the traveled portion of the highway and came to rest upside down in Mr. Scott's path, thereby creating danger of and the setting for the collision which resulted in his death. The evidence does not otherwise show the cause of the casualty; and, as the trial court's refusal of defendant's offered instructions suggests, it does not show Mr. Scott negligent or in control of the instrumentality which caused the casualty. Under the foregoing authorities, the evidence produced the character of situation to which the res ipsa loquitur doctrine is applied. The converse holds in cases where the evidence discloses that two or more instrumentalities, one of which was plaintiff's and only one of which was under defendant's control, contributed to, or may have contributed to, the injury. Speiser, The Negligence Case: Res Ipsa Loquitur, § 2.16; *Estes v. Estes,* 127 S.W.2d 78 (Mo. App.1939); *Hutchins v. Southview Golf Club, Inc.,* 343 S.W.2d 223 (Mo.App.1960); *Copher v. Barbee,* 361 S.W.2d 137 (Mo.App. 1962).

Appellant states the dichotomy that the automobile driven by Mrs. Malcolm was, at the time of its collision with the automobile driven by plaintiff's decedent, either moving or at rest, to argue that if moving, plaintiff's case fails under *Dwyer v. Moss,* 462 S.W.2d 645 (Mo. banc 1971), on the issue of control; and if at rest, it fails under *Frazier v. Ford Motor Co.,* 365 Mo. 62, 276 S.W.2d 95 (banc 1955), for failure to show that Mr. Scott was not contributorily negligent in colliding with a stationary vehicle.

Neither case precludes plaintiff in the uncommon circumstances of her case. *Dwyer v. Moss,* supra, denied the res ipsa loquitur doctrine in a fact situation distinguishable from Mrs. Scott's case. Both Dwyer and Moss adduced evidence—plaintiff Dwyer to show that the Moss automobile being driven northwardly on "Old Sugar Creek Road," skidded 90 feet, left the road, struck a culvert on the east side of the road, and then collided with Dwyer's truck on the west side of the center of the road— defendant Moss to excuse her conduct and to show that Dwyer drove his truck in the middle of the road and caused her to run off the road to the right and then into the collision. In such circumstances, Dwyer's case, if any, existed by virtue of the inference of negligence noted in *Friederich v. Chamberlain,* 458 S.W.2d 360 (Mo. banc 1970), i. e., presence of a motor vehicle on the wrong side of the road at time of collision is, of itself, sufficient to create inference of negligence submissible under MAI 17.01 for submission of a single negligent act coupled with MAI 17.13 for submission of the single negligent act, "Defendant drove on the wrong side of the road." [3] It is true that Mrs. Malcolm was not in control of Mr. Scott's vehicle other than with respect to the circumstances she set in motion and the danger she created; but neither did defendant control the movements of the sidewalk pedestrian injured by defendant's automobile in *Harke v. Haase,* supra. *Frazier v. Ford Motor Co.,* supra, involving a plant accident and thus distinguishable from Mrs. Scott's case, recited the rule that in order to make a prima facie case under the res ipsa loquitur doctrine the evidence must be such as to reasonably exclude the

---

**3.** MAI 17.13 was revised in 1973 to describe the single negligent act as "defendant's automobile

was on the wrong side of the road at the time of the collision." MAI 1973 Pocket Part, p. 55.

negligence of the injured party as a contributing cause of the injury, and determined that defendant had evidence that plaintiff was not injured in the manner he contended and that defendant was entitled to a converse instruction bearing on the merits of plaintiff's submitted case. Plaintiff's verdict was reversed for failure to give such an instruction. The evidence in Mrs. Scott's case is such as reasonably to exclude all defensive inferences attributable by operation of law to the negligence of plaintiff's decedent. *Maxie v. Gulf, M. & O. R. Co.,* supra. So far as the evidence shows, Mr. Scott was driving in his proper lane within the speed limit and tried to avoid when danger showed. There was no evidence to show that he should or could have stopped or otherwise taken effective action to avoid the trap set by Mrs. Malcolm. To the contrary, in the words of Mr. Scott via Mr. Blankenship, "he didn't have time to do anything hardly." Situations in which the doctrine is available against motorists who unexplainedly collide with large, stationary objects or vehicles lawfully parked at or near the curb of a street or highway are also to be distinguished from Mrs. Scott's case on their facts. See, e. g., *Byrne v. Great A. & P. Tea Co.,* 269 Mass. 130, 168 N.E. 540 (1929); *Boresow v. Manzella,* 330 S.W.2d 827 (Mo.1959); Blashfield, Automobile Law and Practice, § 6045.

■ With respect to appellant's assertion that it does not possess superior knowledge or means of information as to the cause of the occurrence, res ipsa loquitur cases impute such knowledge to the driver in control of the offending instrumentality in similar circumstances. *Smith v. Hollander,* 257 P. 577, 579 (Cal.App.1927), held that when an automobile leaves its accustomed place of travel in the street, runs up on the sidewalk, and there strikes a pedestrian, the injured person is not in a position to know the cause of a mishap. The one in control of the instrumentality causing the injury is or should be in a position to know. Such an occurrence does not usually happen in the absence of negligence on the part of the one in control of the automobile. *Harke v. Haase,* supra, l. c. 1003, stated that the res

ipsa loquitur rule applies when an automobile unexplainedly leaves the street "and the plaintiff does not know what caused it to do so. The occurrence would seem to speak negligence, and it is easy to see why an injured plaintiff would not know what specific negligence did cause it." So, in Mrs. Scott's case, Jessie Virginia Malcolm was in position to know why her vehicle left the highway, returned, and came to rest upside down in Mr. Scott's path. The evidence does not show that Mr. Scott knew the cause of the casualty. In such circumstance, it does not appear why Mr. Scott's survivor should be deprived of the doctrine on the ground that Mrs. Malcolm is now unavailable for explanation or excuse, if any, for the casualty.

Appellant contends that the court erred in refusing to direct a verdict on the ground that plaintiff failed to fulfill her burden of establishing that either she or her decedent had complied with the notice conditions of their insurance policy. Appellant has not furnished the policy; however, it appears that the policy required the notice in question "as soon as practicable" following the casualty.

■ This casualty occurred around 4:30 A.M., January 2, 1973. Plaintiff's husband was injured and taken immediately to the hospital. He did not recover but went downhill and expired January 6, 1973. The insurance company admitted it received notice of plaintiff's claim on January 10 by letter dated January 8 from plaintiff's attorney. The rule in this situation "is that, if no time is specified or notice is required to be given immediately, notice given with diligence and in a reasonable time, due regard being had to the attending circumstances, is a legal compliance with such condition." *Columbia Paper Stock Co. v. Fidelity & Casualty Co. of New York,* 104 Mo.App. 157, 78 S.W. 320, 323 (1904); *Soukop v. Employers' Liability Assur. Corp.,* 341 Mo. 614, 108 S.W.2d 86, 92 (1937). Under this rule, the court was not required to convict Mrs. Scott of failure to give her

notice "as soon as practicable" in the attending circumstances.

Judgment affirmed.

All concur.