**In re the MARRIAGE OF Donley E. WEST, Petitioner-Respondent,**

**and**

**Kathy Jo West, Respondent-Appellant.**

**No. 13787.**

Missouri Court of Appeals, Southern District, Division One.

April 16, 1985.

Wayne Gifford, Waynesville, for petitioner-respondent.

Scott B. Tinsley, P.C., Springfield, for respondent-appellant.

GREENE, Judge.

Petitioner, Donley E. West, filed suit seeking to dissolve his marriage to Kathy Jo West. He requested that the marital property be divided, and that he be granted custody of the two minor children of the parties. In her cross-petition, Kathy also sought custody of the children.

Trial by court was held, after which a decree was entered dissolving the marriage and dividing the marital property. Kathy was awarded temporary custody of the children, and Donley was to pay temporary child support and have visitation rights. The trial court further ordered that a home study be made by the Division of Family Services and stated that after it was received, a final custody order would be en-

tered. Neither party objected to this procedure.

A "home assessment" report was subsequently filed with the court. The social worker later filed an amended report which specified the source of several hearsay statements made in the original report. The trial court then entered a final order, placing custody of the children in Donley, with certain specified visitation rights being granted to Kathy.

On appeal, Kathy contends that the final custody order was not supported by substantial evidence, was against the weight of the evidence, and that the home assessment study was inadmissible, and should not have been considered as evidence by the trial court.

Our review is limited by the dictates of *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), which holds that a final order or judgment in a court-tried case will be upheld if it is based on substantial evidence, is not against the weight of the evidence, and is not based on any erroneous declaration or application of law. We exercise great caution in setting aside a judgment in such cases on the ground that it was against the weight of the evidence, and only then with a firm belief that the trial court's judgment was wrong, realizing that the trial court is in a much better position than we to judge the credibility of the witnesses and to determine the weight to be given to their testimony. Therefore, we give the prevailing party the benefit of all favorable evidence and reasonable inferences to be drawn therefrom, disregarding all evidence to the contrary.

The evidence in this case is not exactly overwhelming in favor of either party. Donley is steadily employed as a lineman for the Laclede Electric Co-op. His base gross pay is $424.80 for a 40 hour week. While he is working, the children are taken care of by Cindy Dykes, Donley's girl friend. Donley and Cindy have taken care of the children 75% of the time during the separation of the parties, after Donley filed his petition. The children are neatly dressed, clean, well fed, and healthy.

Kathy was 27 years old at time of trial, and was unemployed. Before the divorce, Kathy developed a liaison with Tom Lindly, a cook for K.P. Services at Fort Leonard Wood, and was living with him at the time of trial. Tom had lived with Angie Morin before moving in with Kathy. At about midnight, two weeks before trial, Angie and Kathy had a fight at the Star Lounge at St. Robert, Missouri, presumably over Tom's affections. About "6 or 8" months before trial, Tom had "produced a firearm" and pointed it at Angie. There is nothing in the record to indicate what kind of firearm it was, or what precipitated the incident.

Kathy was not a high school graduate and had no career job skills. She previously worked as a bar maid in a tavern at Devil's Elbow, as a waitress in various restaurants and as a distributor for "Goodies Galore 'N' More," a company specializing in the sale of various and sundry sexual stimulants and other erotica. Kathy, as a "consultant" for Goodies Galore, peddled the items at house parties, in her words, "like Tupperware." She was fired from her last job as a waitress because of an altercation with another waitress. Kathy planned either to go to beauty school or learn to become a secretary. No specific plans were in evidence as to how the children would be taken care of while she was engaged in these pursuits. When Kathy had the children, she and Tom slept in one bedroom, her daughter in another, and her son on a couch. In addition to Lindly, Kathy admitted having had another lover during her marriage to Donley.

The record indicates that the marriage between Donley and Kathy was a stormy one, with frequent arguments and fights in the presence of the children. Kathy gave as well as she got and, on one occasion, gave Donley a black eye and, on another, scratched his face during an altercation. The little boy had told Kathy, on several occasions, that he wanted to live with his father. Kathy married Lindly after the dissolution decree was final.

The after-trial home study which was filed on April 11, 1984, revealed that Kathy, who had temporary custody of the children, had again taken a job as a waitress. In connection with child rearing practices, the report stated:

Ms. West disciplines her children by spanking them or occasionally having them sit on a chair. This discipline appears to be rather ineffective as the children don't usually respond to this and continue their inappropriate behaviors. This was observed by this worker. Ms. West drops them off at her ex-husband's when she goes to work in the evenings. He feeds them supper and keeps them in the evenings and usually all night. Many times she intends to pick them up at 10:00 p.m. but calls and asks if they can be kept all night. Donley feeds them breakfast and drops them off at her house on his way to work. There are indications that this is quite upsetting to the children, especially Brian.

On April 24, the social worker wrote the judge the following letter:

This letter is in reference to the paragraph 'Child Rearing Practices.' It should be noted that the statements, 'He feeds them supper and keeps them in the evenings and usually all night' and 'Many times she intends to pick them up at 10:00 p.m., but calls and asks if they can be kept all night', were made by Donely [sic] West, not Kathy Jo West, and she states they are incorrect. She stated he does not feed them supper except occasionally. If they are kept all night, it is because Brian wants to stay with his father, not because she does not want them. She added she usually gives in to keep Brian happy. She added Donley does not feed them breakfast, as they are hungry when she gets them. She admitted this was upsetting to Brian, but plans to start counseling for him and herself in May.

The home study report indicated the children were well treated and clean while in Kathy's custody, and that the house where Kathy, Lindly and the children were living was "well kept up, clean, and nicely furnished."

In its order of final custody, the trial court, while granting primary custody of the children to Donley, gave Kathy six weeks of visitation during the summer, commencing June 15, every other weekend from Friday evening until Sunday evening, plus alternate Thanksgiving, Christmas and Easter holidays. The order also provided that Donley pay Kathy $60 for each week she has the children during the summer.

From this evidence, we conclude that the trial court's final order of custody is supported by substantial evidence and is not against the weight of the evidence. While portions of the home study report were hearsay, no objection was made at time of trial to the judge's announced intention of procuring a home study and considering its contents as evidence before making the decision of who should have custody of the children.

Claims of error concerning reception of evidence that are raised here for the first time are waived. Even if we were to hold that the report was inadmissible, there was ample evidence in the record, aside from the home study, to uphold the final custody order.

Judgment affirmed.

TITUS, P.J., and FLANIGAN, J., concur.