In re the Marriage of Pamela J. LISEC, (formerly Pamela J. Coy), Respondent,

v.

Royce B. COY, Appellant.

No. WD 42540.

Missouri Court of Appeals, Western District.

July 10, 1990.

**174**

Kathy Kranitz Sadoun, St. Joseph, for appellant.

Joseph Alfred Morrey, St. Joseph, for respondent.

Before NUGENT, C.J., and FENNER and ULRICH, JJ.

FENNER, Judge.

Appellant, Royce Coy, appeals from an order modifying a decree of dissolution which transferred custody of his son, Aaron, from himself to his former wife, the child's mother, respondent, Pamela Lisec (formerly Coy).

Pamela and Royce were married on April 10, 1981. Their son, Aaron, was born on January 23, 1983. Pamela filed a petition for dissolution on July 21, 1986. On July 29, a temporary order was entered granting custody of Aaron to Pamela. Aaron was in Pamela's custody for over one and one-half years, pending a decision on the merits. Following a hearing on the merits, the trial court issued its judgment and findings of fact on December 9, 1987. Pursuant to the judgment, Royce was awarded custody of Aaron, then four and one-half years old, subject to a visitation plan pronounced for Pamela. For purposes of clarity, that judgment will be referred to as the original judgment. Since that time, Pamela has remarried a man named Ron Lisec. Twin girls were born to that marriage. Royce has not remarried and at the time of the hearing on the motion to modify, lived with Chris, his other son by a prior marriage, and his parents on their farm.

On February 9, 1989, Pamela filed a motion to modify the custody order, alleging that Royce was neglecting Aaron educationally and medically, that Royce allowed Aaron to remain with Royce's parents, that Royce's household was hostile to her and that visitation had been denied. Royce filed a motion to dismiss on July 19, 1989.

The events which ultimately led to the subject of this appeal occurred in July, 1989. Pursuant to the visitation schedule in the dissolution decree, Pamela had visitation for 30 days, beginning June 18, 1989. Royce arranged to have Aaron visit him for two days around the Fourth of July holiday. Royce returned the child following the holiday. Apparently, Aaron developed an illness which required hospitalization, sometime around the Fourth of July, but the etiology and the time of onset of his illness is disputed.

At the end of her summer visitation period, Pamela refused to return Aaron to Royce. On July 24, 1989, Royce filed a motion to cite for contempt and an order to show cause was directed to Pamela on August 2, 1989.

At the hearing on the contempt motion, held August 2, 1989, a good amount of testimony was elicited concerning Aaron's health. Testifying at this hearing were Pamela; Elaine Rickel, Pamela's stepmother; Virginia Stratton, Aaron's babysitter beginning the last week of June, 1989; Dr. Joseph Fisher, a doctor who examined Aaron early in July, 1989; and Royce Coy. In summary, the evidence presented tended to show Aaron to be below normal weight, a picky eater and very thin for his age.

Following the hearing the trial court ruled that Pamela was not in contempt. The trial judge orally made extensive findings on the record concerning his reasons.

Pamela filed a motion for temporary custody on August 2, 1989, the same day as the contempt hearing. A hearing on this motion was held August 4, 1989. Testifying at this hearing were Judith Barnes, custodian of records at Children's Mercy Hospital; Dr. Greg Thompson, Aaron's regular pediatrician during the time he was in Royce's custody; Pamela; and Royce. Following this hearing, the trial court granted temporary custody to Pamela.

On August 30, 1989, a full hearing on the merits was held. The testimony and proceedings at the hearings on the motion to cite for contempt and the motion for temporary custody were adopted by reference. Testifying at this hearing were Dr. Phyllis Roberts, Pamela's pediatrician who treated Aaron; Royce Coy; Dr. Charles Hodge, a pediatrician associated with Children's Mercy Hospital, specializing in pediatric gastroenterology; Nancy Pease, a teacher employed by Royce to tutor Aaron; Linda Nichol, Aaron's pre-school teacher; Dr. Greg Thompson, Aaron's regular pediatrician; Tracy Lisec, Pamela's current husband; and Pamela.

After the parties presented their evidence, the guardian ad litem made his recommendation that custody of Aaron be given to the father.

On September 8, 1989, the trial court issued an ill-advised order, in letter form, to counsel for both parties indicating its decision to return Aaron to Royce's custody, telling Pamela to return Aaron to Royce and stating that a formal order would follow. On September 13, 1989, the trial court issued a Memorandum Opinion on Motion to Modify Custody and Award Other Relief, and a Decree Modifying Custody Order, Providing for Visitation and Child Support and Granting Declaratory Relief. The decree awarded custody of Aaron to Pamela. It is from this final decree modifying custody that Royce appeals.

Royce presents four points on appeal. Because points one and two are closely related, they will be addressed together. In his first point he alleges that the trial court erred in modifying the dissolution decree by transferring custody of Aaron because the findings which form the basis for said transfer are against the weight of the evidence or unsupported by any evidence whatsoever. He cites nine separate findings of the trial court which he claims are contrary to the evidence.

In his second point Royce alleges that certain findings made by the trial court are without evidentiary support and thus do not support the requisite finding of change of circumstance necessary to transfer custody.

■ Royce acknowledges the standard set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), cited in *In Re Marriage of West*, 689 S.W.2d 814, 815 (Mo.App.1985), which deserves, once again, to be repeated:

[A] final order or judgment in a court-tried case will be upheld if it is based on substantial evidence, is not against the weight of the evidence, and is not based on any erroneous declaration or application of law. We exercise great caution in setting aside a judgment in such cases on the ground that it was against the weight of the evidence, and only then with a firm belief that the trial court's

judgment was wrong, realizing that the trial court is in a much better position than we to judge the credibility of the witnesses and to determine the weight to be given to their testimony. Therefore, we give the prevailing party the benefit of all favorable evidence and reasonable inferences to be drawn therefrom, disregarding all evidence to the contrary. Furthermore, deference is given to the trial court even if the evidence could support a different conclusion. *L.R.M. v. P.R.M.*, 780 S.W.2d 111, 112 (Mo.App.1989).

In order to modify child custody provisions of a dissolution decree, the trial court must find, "upon the basis of facts that have arisen since the prior decree ... that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interests of the child." § 452.410, RSMo 1986. The burden to establish substantial change of condition requiring change of custody to serve the best interest of the child is upon the non-custodial parent. *Wilmesherr v. Wilmesherr*, 708 S.W.2d 823, 824 (Mo.App.1986). The change of conditions or circumstances must be of a nature that the child will substantially benefit from the transfer. *Yates v. Yates*, 755 S.W.2d 744, 746 (Mo.App.1988). It is important to defer to the trial judge who had the opportunity to evaluate the credibility, sincerity, and character of the various witnesses. *Id.* Proper considerations pursuant to § 452.375.2, RSMo 1986, are the wishes of the affected parties, including the child, the interaction and interrelationship of the child with parents and siblings, the child's adjustment to home, school and community, the mental and physical health of all involved parties, and the needs of the child for a continuing relationship with the parents. *Id.* (Citations omitted).

The evidence, viewed as a whole, along with the inferences favorable to Pamela, the prevailing party herein, reveals a sufficient change of circumstances to support the transfer. In summary, the evidence adduced at the hearings disclosed that Aaron had been in Royce's custody from the time the dissolution decree was entered, December 7, 1987, until late June, 1989, a period of about one and one-half years. During this time there was evidence that Aaron was continuously underweight and did not eat properly. Aaron was a picky eater, at times he did not want to eat and he frequently complained of stomach problems. There was medical testimony that the eating problems may have been stress related. As is unfortunately not unusual, there was evidence that the parties are very hostile toward each other and these feelings are often expressed in front of Aaron. Since Aaron has been with Pamela, he has gained weight and is at an optimal weight, i.e., in the 50th percentile for his age, as opposed to being in the 10th to 25th percentile range that he had been in the past year.[1]

Dr. Joseph Fisher testified that Aaron was brought in to see him by Pamela in early July, 1989. It was Dr. Fisher's initial observation that at that time Aaron was malnourished. Dr. Fisher observed that Aaron's skin was dry and wrinkled and that Aaron had obvious loss of subcutaneous fat from not having sufficient vitamins, minerals and calories in his diet, all factors which indicated Aaron had not been fed properly and was dehydrated. According to Dr. Fisher, Aaron's condition indicated a long term dietary deficiency. It was Dr. Fisher's feeling that Aaron's condition was such that he should be hospitalized and under the care of specialists. Dr. Fisher advised Pamela to take Aaron to Children's Mercy Hospital. It was his opinion that Aaron's condition was life threatening at that time. Subsequent to Aaron's hospitalization, Dr. Fisher examined him again and observed that Aaron had gained four pounds, his skin was no longer wrinkled, he wasn't dehydrated, and his eyes looked better. In Dr. Fisher's opinion, as a general medical doctor, Aaron's condition was much improved from what it was prior to his admission to Children's Mercy Hospital.

---

**1.** Percentages as derived from standardized Growth Charts based upon the child's age.

The record also reflects that Aaron has learning problems and needs special help in school. At the time of the hearing, he had been tutored by Mrs. Nancy Pease, both during the time he was in the custody of Royce and when he was in Pamela's custody. Aaron was characterized as being developmentally delayed by Linda Nichol, Aaron's kindergarten teacher, who performed a KIDS (Kindergarten Inventory of Development Skills) test on Aaron prior to his entering kindergarten. According to Nichol, Aaron does not have a learning disability, but has speech and language disabilities and articulation problems. She stated that Aaron still needs special attention in areas of speech and language as he is still not caught up to children his age. It is noted that neither Royce or Pamela was faulted for these disabilities by the testimony.

The evidence indicates that placement of Aaron with Pamela will provide a stable environment. Pamela and her husband, Ron, are supportive of Aaron's attempts to develop learning skills.

■ The trial court is not limited to examining only the circumstances of the child and the custodial parent. *McCammon v. McCammon*, 680 S.W.2d 196, 202 (Mo.App.1984). In all cases, the overriding duty of the court is to serve the best interests of the child. *Id.* While Pamela's ability to provide Aaron with a stable, comfortable home is not changed circumstances of the child or custodial parent as provided for in § 452.410, RSMo 1986, it is a significant factor in determining how Aaron's interests may best be met. *Yates*, 755 S.W.2d 744, 746 (Mo.App.1988). From this standpoint, the evidence is supportive of the trial court's order.

■ In point three, Royce argues that the trial court erred in basing its findings in part upon an unfavorable inference drawn from Royce's decision not to call his mother to testify. The challenged statement of the court is as follows:

The failure of [Royce] to present [his mother's] testimony to the court when she was available in the courthouse to testify suggests to the court that counsel

were concerned about the impression she would make on the court or about the testimony that might be elicited from her on cross examination. Holding her off the stand may be a justifiable trial strategy on the part of counsel, but it left the court with no evidence from her about how she conducts herself with the boy. It leads the court to infer that she was considered a risky witness by counsel—a troubling inference when the court considers she is the adult with whom the child spends most of his time while in Respondent's custody.

The statement was made parenthetically to a finding that the Coy family projected hostility toward Pamela and in particular that the hostility involved criticisms by the paternal grandmother.

At the hearing herein Mrs. Pease, Aaron's tutor, testified and stated that she had heard Mrs. Coy, the paternal grandmother, criticize Pamela in front of Aaron. The testimony, which apparently the trial court would have found useful, was as rebuttal for the testimony of Mrs. Pease.

■ The failure of a party to call a witness having knowledge of facts and circumstances vital to the case generally raises a presumption that the testimony would be unfavorable to the party failing to proffer it. *Leehy v. Supreme Express & Transfer Co.*, 646 S.W.2d 786, 790 (Mo. banc 1983) (citations omitted). It is improper, however, for a party to argue the negative inference resulting from his opponent's failure to produce such a witness if the witness is equally available to both parties. *Id.*

Whether a witness is to be considered equally available to the parties on both sides of a lawsuit depends upon several factors. The pertinent factor herein is the relationship borne by the witness to a particular party as the same would reasonably be expected to affect his personal interest in the outcome of the litigation and make it natural that he would be expected to testify in favor of the one party against the other. *Id.*

Mrs. Coy's relationship to her son Royce would lead one to expect that she would be willing to voluntarily appear on his behalf. She most certainly would have knowledge relative to the case, namely the surroundings in which Aaron was being raised, as the evidence showed that both Aaron and Royce lived at her home, and whether or not she criticized Pamela in front of Aaron. The inference drawn was not impermissible under the circumstances herein.

However, the fact that such an inference is permissible is not to say that in custody disputes judges are encouraged to draw such inferences. There can be many valid reasons for a party to choose not to place grandparents or other relatives in the middle of a custody dispute. It would be a disservice for judges to place parties and their lawyers in a position where they are fearful of the consequences for not subjecting every possible witness that is not "equally available" to the emotional strain that is readily apparent in disputes over custody. Grandparents may often times be genuinely concerned with maintaining a viable relationship with both parents in the best interest of the grandchild. When that is the case, courts should be cautious not to misinterpret their lack of involvement in a dissolution hearing.

If the judge in the case at bar chose to believe the testimony of Mrs. Pease that Aaron's paternal grandmother criticized Aaron's mother in Aaron's presence, that was his prerogative as the finder of fact. The judge's gratuitous finding of an adverse interest to support Mrs. Pease's testimony was not necessary and runs the risk of making what already appears from the record to be a difficult and bitter situation worse.

Point three is denied.

■ In his fourth and final point, Royce argues that the trial court erred in relying on the testimony of Dr. Joseph Fisher that Aaron was malnourished because there was no adequate foundation laid for his expert opinion. This is so, Royce alleges, because Dr. Fisher was only a radiologist and not a pediatrician.

Pamela took Aaron to see Dr. Fisher, Pamela's uncle by marriage, during her summer visitation in 1989. Dr. Fisher recommended that Pamela take Aaron to Children's Mercy Hospital because it was his opinion that Aaron was malnourished.

■ Dr. Fisher was not disqualified as a witness for the reason argued by Royce because the extent of a medical expert's experience or training in a given field goes to the weight, not the admissibility of his testimony. *Hord v. Morgan,* 769 S.W.2d 443, 448 (Mo.App.1989). The determination of a physician's ability to testify rests in the sound discretion of the trial judge and should not be set aside absent a showing of an abuse of discretion. *Id.* No abuse has been shown.

Based upon the foregoing, the decision of the trial court is affirmed.

All concur.