Shelly WEAKS and Fannie Weaks, Appellant,

v.

Ronald RUPP, and Marie Rupp, Respondents.

No. WD 53776.

Missouri Court of Appeals, Western District.

April 14, 1998.

---

Thomas E. Thompson, Beamer, Slagg & Thompson, L.L.C., Kansas City, for appellant.

Phillip S. Smith, Kansas City, for respondent.

Before ULRICH, C.J., P.J., and LOWENSTEIN and HOWARD, JJ.

ULRICH, Chief Judge, Presiding Judge.

Shelly and Fannie Weaks ("the Weaks") appeal from the judgment of the trial court entered against them in their action for negligence against their landlords, Ronald and Marie Rupp ("the Rupps"). The case was tried before the court without a jury. The Weaks alleged that the Rupps' negligent maintenance of their furnace caused them to suffer carbon monoxide poisoning. The Weaks raise two issues on appeal. They contend that the trial court erred by (1) finding against them where the Rupps breached their duty to use ordinary care to prevent the furnace in the Weaks' apartment from emitting carbon monoxide; and (2) finding against them where the Rupps were liable under the doctrine of res ipsa loquitur. That part of the judgment finding that the Rupps are not liable under a theory of specific negligence is affirmed. That portion of the judgment finding for the Rupps on Plaintiff's theory of res ipsa loquitur is reversed, and the case is remanded for a new trial to determine the Rupps' liability under the doctrine of res ipsa loquitur.

## FACTS

Shelly Weaks and her mother, Fannie Weaks, were tenants in an apartment building owned and operated by Ronald and Marie Rupp in January 1994. The Weaks complained to the Rupps in January 1994 that the furnace in their apartment smelled of burnt wires and gas. The Rupps called Ben Baskerville, a repairmen with over forty years experience, to repair the furnace. Mr. Baskerville rewired the furnace, replaced the thermocouple and cleaned the pilot burner assembly. He did not determine what caused the wires to burn and did not work on the flue or heat exchanger. Before he left, Mr. Baskerville lit the pilot light and turned the furnace back on to assure it was properly functioning.

Approximately one week later, on January 8, 1994, Fannie awoke in the night and shouted out that she smelled gas coming from the furnace. When Shelly entered Fannie's room she smelt a distinct odor; when she inhaled she fell forward onto the bed. Fannie was suffering loss of her motor skills, had a severe headache, was nauseous and dizzy and could barely sit on the edge of the bed. Shelly helped Fannie from the home. Before leaving the apartment, the Weaks turned off the furnace. No one in the apartment had touched the furnace since the repairs were made one week earlier.

Shelly contacted the Missouri Gas Energy Company. Galen Frank Winn, an installation and service man employed by the Missouri Gas Energy Company for the previous

eight years, went to the Weaks' home to investigate the gas leak. Mr. Winn relit the furnace and conducted tests to determine whether carbon monoxide was present. Mr. Winn took readings at the flue area and at two vents in the apartment; the instrument detected the presence of one percent carbon monoxide, the highest reading available on his instruments. When Mr. Win examined the furnace, he noted that flames rolled out of the furnace from the combustion chamber toward him when it was fired. The flame roll-out had caused the furnace wires, including the wires installed one week earlier, to burn. Mr. Winn determined that because the furnace registers contained black soot, that the furnace's heat exchanger was probably cracked. Mr. Winn shut off the furnace and explained that until repairs had been made, the furnace should not be operated. The Missouri Gas Energy Company recommends that furnaces be cleaned and serviced once a year. The Rupps had not serviced the furnace in the eight years they had owned the apartment complex.

Fannie and Shelly went to the University of Kansas Medical Center for medical treatment. The University of Kansas Medical Center referred the Weaks to the St. Joseph Hospital for testing. St. Joseph Hospital diagnosed both Shelly and Fannie as having carbon monoxide poisoning. Fannie's initial tests revealed that she had a 30.4% pure carbon monoxide level which is indicative of serious exposure and a significant level of toxicity. At this level of toxicity, there is a progressive deterioration of neurologic function if left untreated. Because of this high level of carbon monoxide, St. Joseph Hospital required Fannie to return on January 9 for further tests. Fannie was hospitalized from January 9 to January 11, 1995. She was subjected to psychological testing, blood work, oxygen levels tests and respiratory tests. Fannie was given two treatments in the hyperbaric chamber which involved Fannie being placed on a stretcher and put inside a pressurized sealed chamber with high flow oxygen for ninety minutes per session. Fannie was upset regarding the hyperbaric chamber treatment because she becomes claustrophobic when placed in tight areas.

Fannie's total medical expenses amounted to $1228.04.

Shelly was treated and released from St. Joseph Hospital on January 8, 1994. Shelly's medical bill amounted to $143.60. Shelly missed two days work due to her carbon monoxide poisoning and lost $168.00 income.

After Fannie's release from St. Joseph's Hospital, Fannie and Shelly returned to the apartment. Fannie developed psychological problems because she was scared that she would suffer from carbon monoxide poisoning again. Fannie experienced insomnia and recurrent headaches. Shelly also experienced nervousness when sleeping and had headaches. While Shelly's headaches eventually subsided, Fannie continued to suffer from headaches. Shelly and Fannie moved out of the apartment in February because of their fear of carbon monoxide poisoning.

The Weaks filed suit in the Jackson County Circuit Court seeking compensatory and punitive damages. At the bench trial, Robert Nielson, a heating and air conditioning technician employed by Black & Veatch Consulting Engineers for thirteen years, testified. Mr. Nielson stated a simple furnace, like the one located in the Weaks' apartment, burns natural gas to produce heat. Heat is then blown across the heat exchange into the house. The byproducts of combustion are carbon monoxide, carbon dioxide and water vapor. Because carbon monoxide is poisonous and carbon dioxide is a suffocant, regular maintenance of the furnace is recommended. Mr. Nielson testified that the Weaks' furnace had rust on it; the wires were burnt; the draft diverter was rusted and contained black soot; and the flue pipe had tape on it. Mr. Nielson stated that burnt wires indicate a flame roll-out which can be caused by a crack in the heat exchanger, a misaligned burner or a gas valve that open too slowly to let the gas ignite evenly. At the conclusion of the evidence, the court found on behalf of the Rupps. This appeal followed.

### STANDARD OF REVIEW

In a court-tried case, appellate review is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The appellate court must uphold the trial court's judgment

unless there is no substantial evidence to support it, it is against the weight of the evidence, or the trial court erroneously declared or applied the law. *Id.* at 32. In applying this standard, the appellate court "give[s] the prevailing party the benefit of all favorable evidence and reasonable inferences to be drawn therefrom, disregarding all evidence to the contrary." *Lisec v. Coy,* 793 S.W.2d 173, 175–76 (Mo.App.1990) (quoting *In re Marriage of West,* 689 S.W.2d 814, 815 (Mo.App.1985)). Because the trial court made no findings of fact or conclusions of law, all facts are considered on appeal as having been found in accordance with the result reached, and the trial court's judgment will be affirmed if it is correct on any reasonable theory supported by the evidence. *MFA Inc. v. Pointer,* 869 S.W.2d 109, 111 (Mo.App.1993); *Safeco Ins. Co. of America v. Stone & Sons, Inc.,* 822 S.W.2d 565, 567 (Mo.App.1992).

## I. THE RUPPS ARE NOT LIABLE ON THEORY OF SPECIFIC NEGLIGENCE

As their first point on appeal, the Weaks argue that the trial court erred in finding for defendants on their claim that the Rupps are liable in negligence. The Weaks specifically argue that the Rupps had a duty to properly maintain the furnace; the Rupps breached that duty by negligently maintaining the furnace and allowing carbon monoxide fumes to enter the Weaks' apartment; and the Rupps' breach proximately caused them physical harm and emotional distress.

■ Negligence is the failure to exercise the degree of care which a reasonably prudent and careful person would use under the same or similar circumstances. *Jackson v. City of Blue Springs,* 904 S.W.2d 322, 329 (Mo.App.1995); *Kary v. Missouri Highway & Transp. Comm'n,* 687 S.W.2d 692, 693 (Mo.App.1985). The elements of a negligence claim under Missouri law are proof of (1) existence of a duty on the part of the defendant to protect plaintiff from injury, (2) failure of the defendant to perform that duty, and (3) injury to the plaintiff resulting from such failure." *Nappier v. Kincade,* 666 S.W.2d 858, 860 (Mo.App.1984). Whether a

duty exists is a question of law for the court to decide. *Strickland v. Taco Bell Corp.,* 849 S.W.2d 127, 131 (Mo.App.1993).

■ Whether the Rupps owed a duty to the Weaks is first determined. Under Missouri law, a landlord is legally obligated to maintain in a "reasonably safe condition" those portions of the rental property over which the landlord retains "control." *Ashley v. R.D. Columbia Assoc., L.P.,* 54 F.3d 498, 501 (8 th Cir.1995); *Niman v. Plaza House,* 471 S.W.2d 207, 210 (Mo. banc 1971); *Kilmer v. Browning,* 806 S.W.2d 75, 79 (Mo.App. 1991). Ordinarily, a landlord retains control of the heating, electrical and plumbing fixtures in a building. *Kilmer,* 806 S.W.2d at 79; *Niman,* 471 S.W.2d at 210. Even where there are plumbing and heating fixtures in an apartment leased to tenants, they are usually controlled by the landlord as they must be maintained and used in conjunction with the entire building. *Kilmer,* 806 S.W.2d at 79.

■ The undisputed evidence establishes the furnace in the Weaks' apartment was under the control of the Rupps. The Rupps were responsible for providing heat to the apartment. The Rupps owned and maintained all portions of the hearing mechanisms, including the furnace located in the Weaks' apartment. The Rupps provided repairs and maintenance on the furnace when necessitated. For example, when the Weaks complained that the furnace in their apartment smelled of burnt wires, the Rupps called Mr. Baskerville to repair the furnace. And when the furnace emitted carbon monoxide fumes on January 8, 1994, the Weaks hired a repairmen to repair the furnace and ascertain the source of the carbon monoxide fumes. Mr. Rupp admitted that he was in charge of the maintenance of the furnace. Because the Rupps owned the furnace and retained sole responsibility for the repairs and maintenance of the furnace, the Rupps exercised "control" over the furnace and, therefore, had a duty to maintain the furnace in a reasonably safe condition.

■ Whether the evidence supports a finding of breach of duty and causation is next determined. The Weaks argue that the trial court erred in finding for the Rupps

because the Rupps failed to properly inspect, maintain and repair the furnace so as not to emit carbon monoxide. Even *assuming arguendo* that the Rupps were negligent in their maintenance and repair of the furnace, however, substantial evidence supports a finding that the Weaks failed to establish the requisite causation. Actionable negligence requires a causal connection between the conduct of the defendant and the resulting injury to the plaintiff. *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241, 244 (Mo. banc 1984). Proving causal connection between allegedly negligent act and injury requires showing of two things: causation in fact and proximate cause. *Koerber By and Through Ellegood v. Alendo Bldg. Co.*, 846 S.W.2d 729, 730 (Mo. App.1992). Causation in fact exists where the injury would not have happened "but for" the defendant's negligence or when the defendant's "conduct is a substantial factor in bringing about the harm." *Id.* at 731. Proximate causation exists where "the injury appears to be the natural and probable consequence, unbroken by any new cause of the act or omission of the defendant without which the accident would not have occurred." *Ashley*, 54 F.3d at 501; *Buck v. Union Elec. Co.*, 887 S.W.2d 430, 434 (Mo.App.1994).

Substantial evidence supports a finding that the Weaks failed to establish the requisite causal connection between the Rupps' allegedly negligent maintenance of the furnace and their injuries from carbon monoxide poisoning. The evidence established that the carbon monoxide fumes emitted from the furnace; the tests performed by Mr. Winn the night the Weaks suffered from carbon monoxide poisoning indicated the presence of one percent carbon monoxide, the highest reading available on the instruments. While the evidence, therefore, established the carbon monoxide fumes emitted from the furnace, no evidence was presented to show that the Rupp's allegedly negligent maintenance of the furnace was causally connected to the emission of the carbon monoxide fumes. For example, both Mr. Winn and Mr. Nielson stated that the flame roll out from the combustion chamber of the furnace which caused the exposed wires to burn indicated a possible cracked heat exchanger. A crack in the heat exchanger would allow carbon monoxide fumes to emit into the Weaks' apartment. The Rupps, however, had tests done on the heat exchanger to determine if a crack existed. A smoke bomb was placed inside the heat exchanger. No smoke emitted into the Weaks' apartment, thereby indicating that no crack existed. Furthermore, while the Weaks note that the furnace was not inspected from 1988–1994 and the furnace pipes were rusted, the Weaks have failed to adduce any evidence establishing that either the lack of inspection or the rusting of the furnace pipes could cause carbon monoxide fumes to emit into the apartment. Because substantial evidence supports a finding that the Weaks failed to establish a causal connection between the Rupps' allegedly negligent maintenance of the furnace, the trial court could have reasonably found that the Weaks failed to prove an actionable case of negligence. The trial court, therefore, did not err in entering judgment in favor of the Rupps. Point one is denied.

## II. THE DOCTRINE OF RES IPSA LOQUITUR IS APPLICABLE

The Weaks contend as their second point on appeal that the trial court erred in finding the doctrine of res ipsa loquitur inapplicable and in not finding for them as the trier of fact under the doctrine of res ipsa loquitur. The Weaks argue that application of res ipsa loquitur was proper because the Rupps owned and controlled the Weaks' furnace, failed to properly maintain and repair the furnace, and, thereby, injured them when carbon monoxide fumes were emitted in their apartment.

The doctrine of res ipsa loquitur is a rule of evidence that permits a jury to infer from circumstantial evidence that the defendant is negligent without requiring that the plaintiff prove defendant's specific negligence. *Trefney v. Nat'l Super Markets, Inc.*, 803 S.W.2d 119, 121 (Mo.App.1990). Like any other case, the plaintiff begins in a res ipsa loquitur case bearing both the burden of proof and the burden of evidence. *McCloskey v. Koplar*, 329 Mo. 527, 46 S.W.2d 557, 563 (1932). The plaintiff must prove the doctrine's three elements: "(1) the incident resulting in injury is of the kind which ordi-

narily does not occur without someone's negligence; (2) the incident is caused by an instrumentality under the control of the defendant; and (3) the defendant has superior knowledge about the cause of the incident." *Trefney*, 803 S.W.2d at 121. By plaintiffs proving the three elements, the defendant must meet a broader assault than that posed by specific allegations of negligence under a specific negligence theory. *McCloskey*, 46 S.W.2d at 563. The plaintiff, however, still bears the risk of nonpersuasion and must show by the greater weight of the evidence that injury resulted from the defendant's negligence. *Id.*

A party seeking the application and benefit of the doctrine of res ipsa loquitur need not submit facts surrounding the occurrence that exclude all reasonable hypotheses except defendant's negligence. *Cremeens v. Kree Institute of Electrolysis, Inc.*, 689 S.W.2d 839, 842 (Mo.App.1985); *Strick v. Stutsman*, 633 S.W.2d 148, 151 (Mo. App.1982). The application of the doctrine simply requires that facts and circumstances be shown to have existed from which one can conclude that, more often than not, an occurrence or accident of the type involved results from a failure to exercise reasonable care by the party in charge of the instrumentality. *Id.* Res ipsa loquitur is incompatible with proof of specific negligence. *Bonnot v. City of Jefferson City*, 791 S.W.2d 766, 769 (Mo. App.1990). As the court in *Bonnot* noted:

> If the plaintiff proves the cause of the casualty, it is no longer possible to rely on a presumption of the defendant's negligence attributable to other unspecified acts or omissions. The res ipsa loquitur rule aids the injured party who does not know and therefore cannot plead or adduce proof showing the specific cause of or how the event which resulted in his injury occurred, but if he knows how it came to happen, and just what caused it, and either specifically pleads or proves the cause, there is neither room nor necessity for the presumption or inference which the rule affords.

*Id.* However, "if the plaintiff's evidence tends to show the cause of the occurrence but if that evidence also leaves the cause in doubt

or not clearly shown, plaintiff will not be deprived of the benefit of the res ipsa loquitur doctrine." *Id.*

On appeal, the evidence presented is not reweighed. *Strick*, 633 S.W.2d at 152. The reviewing court's duty in res ipsa loquitur cases is "to determine whether certain circumstances warrant an inference where application of the doctrine is sought. Determination of the application of the doctrine is a matter of law left to the exclusive province of our courts and is not left for determination by the jury as a factfinder." *Id.* The character and nature of the event, not the mere fact of its occurrence, determines whether the doctrine of res ipsa loquitur applies. *Id.* For the doctrine to apply, the event must be an unusual occurrence that ordinarily results from negligence and from which, therefore, negligence is a reasonable inference. *City of Kennett v. Akers*, 564 S.W.2d 41, 45 (Mo. banc 1978). Whether an occurrence that gave rise to a lawsuit is "unusual," thereby satisfying the criteria for applying the doctrine of res ipsa loquitur, is a judicial decision determined by applying the wisdom gleaned from common experience to the event. *Id.*

The Rupps concede that the Weaks' injury is of the kind that does not ordinarily occur without someone's negligence. Whether the evidence would support a finding that the furnace was under the Rupps' control and whether the Rupps had superior knowledge of the cause of the incident is, therefore, determined. The "control" element of res ipsa loquitur has been explained as follows:

> If the plaintiff shows the defendant was in exclusive control of the instrumentality which caused the accident, he has inferentially focused negligence upon defendant. If the plaintiff does not show the defendant's exclusive control of the instrumentality, he still may fix the defendant with responsibility for the negligence by showing the defendant had the right or power to control the instrumentality and the opportunity to exercise it.

*Mahan v. Missouri Pacific R. Co.*, 760 S.W.2d 510, 513 (Mo.App.1988). The re-

quirement that the instrumentality be under the management and control of the defendant does not mean, nor is not limited to, actual physical control, but refers rather to the right of control at the time the negligence was committed. *Niman,* 471 S.W.2d at 209.

In *Niman,* tenants of a fifth floor apartment in an eleven story building were injured when the pipes to the radiator heating system in their apartment ruptured causing hot water and slime to enter their apartment. *Id.* The court found the landlords were liable under the doctrine of res ipsa loquitur. *Id.* at 211. The court reasoned that the defendants retained control over the heating system because the defendants were to provide heat to the apartment; the defendants owned and maintained all portions of the heating mechanism; and the plaintiff had no interest in the heating system other than to report defective conditions to the landlord. *Id.* at 210–11. The court concluded that because "the defendants had sole and exclusive control of the entire heating system and particularly that portion which ruptured and caused the damage suffered" the plaintiff's case was properly submitted under the res ipsa loquitur theory. *Id.* at 211.

Here, too, the evidence conclusively establishes that the Rupps maintained control of the heating system. As in *Niman,* the Rupps owned the heating system in the apartment building, including the furnace located in the Weaks' apartment. As in *Niman,* the Rupps had sole responsibility for the repair and maintenance of the heating system. As in *Niman,* the Weaks' only interest in the heating system was to provide notice to the Rupps when it was not properly functioning. Because the Rupps maintained the exclusive control over the furnace in the Rupps apartment the Weaks have established the second element for application of res ipsa loquitur just as the tenants in *Niman* made a submissible case under res ipsa loquitur.

Whether the evidence supports a finding of "superior knowledge" as to the cause of the carbon monoxide emission is next determined. Missouri courts often infer the "superior knowledge" element of res ipsa loqui-tur from the defendant's control over the instrumentality at issue. *See Niman,* 471 S.W.2d at 207 (inferring superior knowledge of cause of defective pipes in heating system from landlord's exclusive control over heating system in apartment building); *Gates v. Tauchen,* 497 S.W.2d 183, 185 (Mo.1973) (inferring superior knowledge from control where plaintiff and defendant were walking and defendant's automatic shotgun discharged causing injury to plaintiff because "[d]efendant knew or should have known the cause since it is alleged he had exclusive control of the instrumentality"); *Brown v. Bryan,* 419 S.W.2d 62, 67 (Mo.1967) (finding submission of plaintiff's res ipsa loquitur case proper in case where carpool member was thrown out of automobile when door flew open in part because the element of superior knowledge "is implicit in the required finding that defendant was the driver and operator of the faulty instrumentality ..."); *Scott v. Club Exchange Corp.,* 560 S.W.2d 289, 295 (Mo. App.1977) (holding defendant liable under res ipsa loquitur because defendant, as driver of the vehicle which injured plaintiff, had superior knowledge or means of information as to cause of the occurrence); *McDowell v. Southwestern Bell Tel. Co.,* 546 S.W.2d 160, 170 (Mo.App.1976) (holding telephone company liable for acoustical trauma brought about from loud noise emitted by telephone because telephone company possesses superior knowledge or means of acquiring superior knowledge of cause of occurrence); *Epps v. Ragsdale,* 429 S.W.2d 798, 802 (Mo.App.1968) (finding superior knowledge implicit in "the admitted fact of the operator's training and the required finding of management and control" where defendant gave plaintiff a permanent wave which injured plaintiff's hair and scalp).

The uncontradicted evidence showed that the furnace within the Weaks' apartment emitted carbon monoxide fumes. The Rupps have superior knowledge as to the cause of the emission of the carbon monoxide fumes from the Weaks' furnace. As in *Niman,* the Rupps' superior knowledge is primarily inferred from their exclusive control over the heating system. The Rupps, as landlords, exercised sole responsibility for the repair

and maintenance of the heating system in the Weaks' apartment building. When the Weaks' furnace malfunctioned, the Rupps sent Mr. Baskerville to the Weaks' apartment to inspect the furnace. Mr. Baskerville, acting on behalf of the Rupps, inspected the furnace in an attempt to ascertain the source of the problem. Having inspected the furnace, Mr. Baskerville had superior knowledge or means of information as to the source of the carbon monoxide emission. Mr. Baskerville's superior knowledge is imputed to the Rupps as Mr. Baskerville inspected and repaired the furnace at the Rupps' request and on their behalf. The Rupps' exclusive control over the furnace and their superior knowledge or means of information as to its defects stands in sharp contrast to the Weaks' knowledge who, as tenants, had no exact knowledge as to the detailed mechanical operation involved in the maintenance and repair of the furnace. These circumstances supplied the element of the Rupps' superior knowledge or means of information as to the cause of the occurrence. The Weaks, therefore, adduced sufficient evidence to establish that the carbon monoxide emission did not ordinarily occur without someone's negligence; the furnace emitting the carbon monoxide was under the control of the Rupps; and the Rupps had superior knowledge or means of information as to the cause of the carbon monoxide emission. Accordingly, the Weaks made a submissible case under the doctrine of res ipsa loquitur.

 Having made a submissible case under res ipsa loquitur, the Weaks were entitled to consideration by the trier of fact of the Rupps' liability. The Weaks' establishment of a submissible case under res ipsa loquitur resulted in a permissible, rebuttable inference of negligence by the Rupps. *Hale v. American Family Mut. Ins. Co.*, 927 S.W.2d 522, 525 (Mo.App.1996); *Graham v. Thompson*, 854 S.W.2d 797, 799 (Mo.App. 1993); 57B AM. JUR.2d *Negligence* § 1926. The trier of fact, therefore, could draw an inference of negligence from the Weaks' proof of their injury and the surrounding circumstances. *Graham*, 854 S.W.2d at 799. The inference of negligence, however, was not compelled. *Id.* Res ipsa loquitur is a

rule of evidence that allows the trier of fact to determine, based on the strength of the inference, whether a certain injury must have resulted from negligence. *Id.* While Missouri courts have recognized that the defendant may introduce evidence to rebut the inference of negligence, the defendant is not required to introduce any evidence countering the evidence suggesting negligence. *Id.*; 57B AM. JUR.2d *Negligence* § 1926. The trier of fact remains free to reject the inference of negligence even if no countervailing evidence was introduced by the defendants. The Weaks, at all times, therefore, retained the burden of proof regarding the liability of the Rupps under the doctrine of res ipsa loquitur.

The trial court entered judgment in favor of the Rupps on the Weaks claim of res ipsa loquitur. The trial court, however, did not make any findings of fact or conclusions of law regarding its determination that the Rupps were not liable under the doctrine of res ipsa loquitur. On review, whether the trial court decided that res ipsa loquitur was inapplicable or whether it applied the doctrine and chose to reject the inference of negligence established by the Weaks cannot be determined from the record. Because the Weaks made a submissible case under the doctrine of res ipsa loquitur, and upon review of the record, whether the trial court applied the doctrine of res ipsa loquitur is undeterminable, remand is required. The case is remanded to the trial court for a new trial to determine whether the Rupps are liable under the doctrine of res ipsa loquitur. Point two is granted.

The decision of the trial court finding that the Rupps are not liable under a theory of specific negligence is affirmed. That portion of the judgment finding for defendants on plaintiff's theory of res ipsa loquitur is reversed, and the case is remanded for the trier of fact to determine the Rupps' liability under the doctrine of res ipsa loquitur.

All concur.