STATE of Missouri ex rel. GS TECHNOLOGIES OPERATING CO., INC., d/b/a GST Steel Company, Appellant,

v.

The PUBLIC SERVICE COMMISSION OF the STATE OF MISSOURI, Respondent,

Kansas City Power & Light, Defendant.

No. WD 61290.

Missouri Court of Appeals, Western District.

Sept. 16, 2003.

As Modified on Denial of Rehearing Oct. 28, 2003.

Paul S. Deford, Kansas City, MO, for appellant.

Lera L. Shemwell, Robert P. Gingrich, Jr., Jefferson City, MO, for respondent.

Before ELLIS, C.J., BRECKENRIDGE and SMITH, JJ.

PATRICIA BRECKENRIDGE, Judge.

G.S. Technologies Operating Co., d/b/a GST Steel Company (GST), appeals the Public Service Commission's decision that GST had failed to prove that Kansas City Power & Light Company's (KCPL) imprudence caused an explosion that destroyed one of KCPL's generating units, resulting in KCPL's providing inadequate and unreliable service to GST and charging GST unjust and unreasonable rates. On appeal, GST contends that (1) the Commission acted arbitrarily and capriciously and abused its discretion in deciding to give "little weight" to the testimony of GST's expert; (2) the Commission acted arbitrarily and capriciously and abused its discretion by failing to make findings on a theory of imprudence GST raised; (3) the Commission erred by placing the burden on GST to prove KCPL's imprudence and in failing to recognize a rebuttable presumption of KCPL's imprudence under the doctrine of res ipsa loquitur; and (4) the Commission acted arbitrarily and capriciously and abused its discretion in refusing to make findings on whether KCPL was required to use insurance proceeds to offset the cost of replacement power in calculating GST's rate.

This court finds that the Commission erroneously interpreted the law in evaluating the testimony of GST's expert and erred in failing to make findings on one of the theories of imprudence GST raised. Therefore, that portion of the judgment of the circuit court affirming the Commis-

sion's decision that the charges of KCPL to GST were at all times just and reasonable and that GST was not overcharged is reversed. The cause is remanded with directions to reverse the Commission's decision and remand to the Commission to reconsider the expert's testimony and the attachments to his testimony that were admitted without objection and make findings on GST's theory that KCPL was imprudent in how it responded to the flooding to determine whether the charges to KCPL were just and reasonable at all times. The Commission did not err in placing the burden of proof on GST to prove KCPL's imprudence, nor did the Commission err in determining that it was without power to determine whether KCPL should use insurance proceeds to offset the cost of replacement power in calculating GST's rate under KCPL and GST's special contract, so the portion of the circuit court judgment affirming these actions by the Commission is affirmed.

The judgment affirming the Commission's Report and Order is affirmed, in part, and reversed, in part, and remanded.

### Factual and Procedural Background

■ On appeal from a decision of the Commission, this court views the evidence, and any inferences therefrom, in the light most favorable to the Commission's order.[1] *State ex rel. Associated Natural Gas Co. v. Pub. Serv. Comm'n*, 37 S.W.3d 287, 292 (Mo.App.2000). GST was a corporation engaged in manufacturing steel in Kansas City.[2] Specifically, GST manufactured grinding balls and rods for the mining industry and carbon wire rods. In its manufacturing process, GST consumed ex-

tremely large amounts of electricity, which it purchased from KCPL. GST had no other source of electricity available to it in Kansas City other than KCPL.

GST was KCPL's largest single-point retail customer. To acquire electric service at an advantageous price, GST entered into a special contract with KCPL, which was approved by the Commission. Under the special contract, GST was permitted to schedule production when KCPL's incremental costs were low. The contract also provided a formula for calculating the price GST was to pay for electricity. The contract price included a fixed component and a variable component. Factors affecting the variable component included KCPL's fuel costs, operations and maintenance expenses, and purchased power expenses.

Under the special contract, GST paid significantly less for electricity than it would have paid under KCPL's general service tariffs. Pursuant to the terms of the contract, GST was not subject to rate increases, nor did it benefit from rate decreases that applied to KCPL's regular Missouri retail customers. The special contract permitted GST to opt for service under any of KCPL's general service tariffs at any time, but GST never exercised this option.

KCPL provided power to GST and its other customers through its operation of seven fossil-fuel generating units, one nuclear generating unit, and several gas or oil peaking units. Among these units, KCPL uses the lower-cost generating units to provide power before using the higher-cost generating units. One of its

---

1. The facts have been adopted in large part from the Commission's Report and Order, and we utilize portions of that Report and Order without quotation marks.

2. When the Commission issued its decision, GST was still in business in Kansas City. While it has since ceased its steel production in Kansas City, that fact does not affect any of the issues raised in this appeal.

more economical generating units was the Hawthorn Generating Station Unit No. 5 (Hawthorn 5), a coal-fired baseload [3] generating unit that began providing service in 1956.

Hawthorn 5's eleven-story boiler was destroyed by an explosion that occurred at about 12:30 A.M. on February 17, 1999. This caused the immediate shutdown of the Hawthorn 5 unit. The staff of the Public Service Commission opened an investigation into the incident to determine the cause of the explosion and what action, if any, was needed. Meanwhile, to replace the power that had been generated by Hawthorn 5, KCPL relied upon more expensive system resources and purchased higher-priced replacement power on the energy market. KCPL did, however, receive $5 million in proceeds from an insurance policy covering its replacement energy expense in the event of an incident such as the Hawthorn 5 explosion. KCPL informed GST that the Hawthorn 5 outage would probably result in an increase in KCPL incremental costs and that these increased costs would be reflected in GST's rate under the special contract. The variable portion of GST's rate under the special contract did, in fact, rise by $3 to $4.2 million.

On May 11, 1999, GST filed a petition asking the Commission to continue its investigation into the Hawthorn 5 explosion and also to investigate the adequacy, reliability and prudence of KCPL's service to GST in general, both before and after the Hawthorn 5 explosion. In addition, GST asked the Commission to investigate the justness and reasonableness of the prices KCPL charged, particularly in light of the insurance proceeds KCPL received from the Hawthorn 5 explosion.

The Commission held an evidentiary hearing on April 17 and 18, 2000. The parties agreed that there were eight issues before the Commission. The issues which are the subject of this appeal were whether KCPL operated and maintained the Hawthorn 5 unit in a reasonable and prudent manner; whether KCPL's charges to GST were "just and reasonable"; and whether KCPL should have offset any of the costs of purchasing replacement power with the insurance proceeds it received as a result of the explosion of the Hawthorn 5 unit.

After receiving written and live testimony from the parties' witnesses, the Commission entered its Report and Order on July 13, 2000. In its Report and Order, the Commission stated that GST "failed to show that imprudence on the part of KCPL employees caused the explosion at Hawthorn 5 on February 17, 1999." The Commission was careful to point out, however, that it was not concluding that KCPL was not responsible for the Hawthorn 5 explosion but, rather, that it was "unable on this record to determine that issue." The Commission noted that it considered "the Hawthorn 5 explosion to be an open question, pending the conclusion of Staff's ongoing investigation." With regard to the reasonableness of KCPL's rates, the Commission concluded that KCPL's charges to GST were "just and reasonable." The Commission found that "[t]he charges were properly and correctly calculated under the special contract, which was freely negotiated by the parties and approved by the Commission." On the issue of whether KCPL should have reduced the costs of purchasing replacement power by the insurance proceeds it received as a result of the Hawthorn 5 explosion, the Commission found that it did not have the authority to "direct KCPL to recalculate

---

**3.** A "baseload" unit is one that is always operated at maximum capacity.

its charges to GST for electrical service already rendered, or to be rendered, using insurance proceeds received with respect to the Hawthorn 5 explosion to reduce the cost of replacement power."

GST filed a petition for writ of review in the Cole County Circuit Court. Following oral argument, the court affirmed the Commission's decision on March 26, 2002. GST filed this appeal.

### Standard of Review

 On appeal, this court reviews the Commission's decision, and not the circuit court's judgment. *State ex rel. Alma Tel. Co. v. Pub. Serv. Comm'n*, 40 S.W.3d 381, 387 (Mo.App.2001). The Commission's decision is presumed valid, and the party attacking it has the burden of proving its invalidity. *Id.* To review the Commission's decision, this court uses a two-part test. This court first determines whether the Commission's order was lawful. *Id.* An order is lawful if there is statutory authority for its issuance. *Id.* at 387–88. "In determining whether the Commission's order is lawful, an appellate court must exercise unrestricted, independent judgment and correct erroneous interpretations of the law." *Id.* at 388.

 If this court finds that the Commission's order was lawful, this court must then determine whether the order was reasonable. *State ex rel. Midwest Gas Users' Ass'n v. Pub. Serv. Comm'n*, 976 S.W.2d 470, 476 (Mo.App.1998). " 'The reasonableness of the PSC's order depends on whether it was supported by competent and substantial evidence upon the whole record; whether it was arbitrary, capricious, or unreasonable; or whether the PSC abused its discretion.' " *Associated Natural Gas*, 37 S.W.3d at 292 (quoting *State ex rel. Inter–City Beverage Co. v. Pub. Serv. Comm'n*, 972 S.W.2d 397, 401 (Mo.App.1998)). This court will not substi-

tute its judgment for that of the Commission. *Alma Tel. Co.*, 40 S.W.3d at 388. The Commission's order will not be disturbed unless this court finds that it was "clearly contrary to the overwhelming weight of the evidence." *Id.*

### Commission Erroneously Interpreted the Law in its Consideration of Expert's Testimony

In its first point, GST argues that the Commission erred in how it considered the testimony of GST's expert. To support its assertion that KCPL's imprudence caused the explosion at the Hawthorn 5 unit, GST offered the testimony of Jerry N. Ward. Mr. Ward is an energy and deregulation consultant. In Mr. Ward's opinion, the Hawthorn 5 explosion occurred because KCPL "acted in an unreasonable, imprudent and unsafe manner." Specifically, Mr. Ward opined that the explosion "was the product of a chain of unsafe and imprudent KCPL actions and omissions that transpired over nearly a twelve hour period" preceding the explosion.

Mr. Ward described the sequence of events that he believed led to the explosion. On February 12, 1999, KCPL shut down the Hawthorn 5 generating unit for a forced outage due to a ruptured steam line. When it did so, it shut off the gas flow to the boiler and placed a "hold" on the gas value. Four days later, during the early hours of February 15, 1999, KCPL initiated a heat-up of Hawthorn 5. Initiating a heat-up includes sealing the boiler, establishing a vacuum, and opening gas valves to introduce gas to the igniters. Flames from the burners then begin to heat the boiler. Hawthorn 5's operators control this process using a computerized Burner Management System. The Burner Management System was a fail-safe system that alerted employees to any unsafe conditions and automatically closed all gas

valves if the flame went out or if any potentially explosive or unsafe conditions developed.

While the KCPL employees were starting the heat-up process, two independently-contracted workers were attempting to weld a feed water heater. In attempting to establish a vacuum as part of the heat-up process, KCPL employees noticed that the weld repair was not complete and, in fact, the employees were told that the repair would take at least another twelve hours. So, the shift supervisor decided to stop the heat-up process, and he instructed the control operator to "take all the fuel out of the boiler."

Later that afternoon, around 3:00 P.M., the toilets in the control room began to overflow. The cause of the overflow was a wastewater sump pump operating while the main sewer line was plugged. Two outside maintenance contractors were on site attempting to clear the sewer line, and had removed the toilet from the control room's restroom.

The water from the control room's restroom traveled down drains, electrical conduits, and other openings in the control room floor to the computer room located several floors below. The water in the computer room caused electrical shorts to occur in the Burner Management System. A technician was called to the plant to assist in repairing the Burner Management System.

The Burner Management System was under repair for more than eight hours. Despite the fact that the plant was supposed to be shut down during this time and, thus, no fuel was supposed to be in the boiler, fuel was flowing into the boiler. The flow of gas into the boiler continued to increase until 12:30 A.M. on February 17, 1999, when the explosion occurred. After the explosion, a KCPL employee saw a fireball in the rubble of the boiler, which indicated that gas valves were open and gas was continuing to flow into the boiler. Upon seeing this, the employee shut the main gas valve to stop the gas flow.

In Mr. Ward's opinion, KCPL's employees had two distinct chances during this sequence of events to prevent the explosion. According to Mr. Ward, it is "basic electric industry practice" while working on control devices to take measures to prevent the movement of things the devices control, such as gas through valves. Also, it is common industry practice to place a "hold" on the use of equipment that could inadvertently be operated in a system that is degraded.

Mr. Ward opined that the first chance KCPL had to prevent the explosion was to place a "hold" on the wastewater sump pump while the main sewer line was plugged. Had KCPL placed a "hold" on the sump pump, Mr. Ward believed it to be "improbable there would have been a flood of wastewater to the control room and computer room." Since no "hold" was placed on the sump pump and the flooding occurred, however, the second chance KCPL had to prevent the explosion was to place a hold on the gas valves. Mr. Ward believed that during the "drying out" process for the Burner Management System after the flooding caused it to malfunction, the gas valves to the boiler somehow opened. According to Mr. Ward, a "hold" would have prevented the "inadvertent opening" of the gas valves and, therefore, would have "preclude[d] the admittance of gas to the boiler," which ultimately triggered the explosion.

In addition to offering his opinion as to KCPL's actions with regard to the Hawthorn 5 explosion, Mr. Ward also offered his opinion regarding KCPL's adequacy and reliability of service before the Hawthorn 5 explosion. In forming these opin-

ions, Mr. Ward relied on a variety of documents including, among other things, written statements from several KCPL employees and an affidavit from GST's central maintenance manager, Ronald F. Lewonski. KCPL moved to strike a portion of Mr. Ward's testimony in which he discussed allegations made by Mr. Lewonski in his affidavit regarding the reliability of KCPL's service to GST. KCPL argued that Mr. Lewonski's affidavit was essentially hearsay testimony that GST was offering through Mr. Ward and was, therefore, inadmissible. The regulatory law judge declined to strike any of Mr. Ward's testimony, but instead ruled that any facts asserted by Mr. Lewonski in his affidavit would be admitted only to show the basis of Mr. Ward's opinion, and not for the truth of the matters asserted therein. KCPL did not object to the admission of any of the written statements from KCPL employees that were attached to Mr. Ward's testimony, nor did KCPL object to any of the other documents attached to Mr. Ward's testimony.

Nevertheless, in discussing the evidence, the Commission stated in its Report and Order that KCPL had objected to *all* of the hearsay statements attached to Mr. Ward's testimony, and that the regulatory law judge had limited the admissibility of those statements:

> KCPL objected to Mr. Ward's testimony to the extent that it relied on inadmissible evidence, such as the statements of persons who were not themselves called as witnesses. Mr. Ward was permitted to testify, but the information he relied upon was received only to show the basis of his opinion, and not as substantive evidence.

The Commission then stated numerous principles of law that it believed governed its consideration of the hearsay statements attached to Mr. Ward's testimony. It first discussed the principle that an expert witness can rely on hearsay evidence to support his opinion, and such evidence does not need to be independently admissible. Nevertheless, the expert's reliance on inadmissible evidence does not transform that evidence into competent substantive evidence. Moreover, the Commission noted that "[a]n expert's opinion testimony is not the proper vehicle by which to introduce into the record as independent, substantive evidence the evidence upon which the expert relied in reaching that opinion." The Commission also noted that "[h]earsay evidence is not competent and substantial evidence such as can support a finding, conclusion or decision by this Commission."

The Commission then stated that "[m]ost of the information relied on by Mr. Ward was admitted only for the limited purpose of showing the basis of his expert opinion." The Commission concluded that "[b]ecause Mr. Ward's opinion testimony is unsupported by substantive evidence, the Commission will accord it little weight."

The Commission went on to discuss Mr. Ward's theory that KCPL's failure to place a hold on the sump pump while the sewage system was under repair caused the wastewater backup that, in turn, resulted in the control room flooding. But, in discussing this theory, the Commission pointed out that GST had not placed any of the facts Mr. Ward relied on in the record, "thereby precluding the Commission from finding that the chain of events hypothesized by Mr. Ward had actually occurred." The Commission did not discuss Mr. Ward's theory that KCPL's failure to place a hold on the gas valves while the Burner Management System was under repair resulted in gas leaking into boiler, which ultimately triggered the explosion. Instead, the Commission merely concluded, after discussing Mr. Ward's theory as to KCPL's

failure to place a hold on the sump pump, that "GST has failed to show that imprudence on the part of KCPL employees caused the explosion at Hawthorn 5 on February 17, 1999."

When the Commission reached this conclusion, it based its ruling upon a mischaracterization of the extent of KCPL's objection to Mr. Ward's testimony and misstatements of law. KCPL's only objection to Mr. Ward's testimony was to the attachment of Mr. Lewonski's affidavit, and Mr. Ward's reliance on that affidavit. Thus, the sole attachment to Mr. Ward's testimony that was received for the limited purpose of showing the basis of his opinion and not as substantive evidence was Mr. Lewonski's affidavit. Mr. Ward did not rely on any facts from Mr. Lewonski's affidavit in formulating his theory as to KCPL's imprudence with regard to the Hawthorn 5 explosion.[4] Rather, the acts that supported Mr. Ward's theory were contained in all of the other statements and documents attached to Mr. Ward's testimony to which KCPL raised no objection.[5]

As the Commission noted in its Report and Order, "[s]tatements in violation of evidentiary rules do not qualify as competent and substantial evidence" in administrative proceedings. *Concord Publ'g House, Inc. v. Dir. of Revenue*, 916 S.W.2d 186, 195 (Mo. banc 1996). But this is true only "when proper objection is made and preserved." *Id.* "[H]earsay testimony may be considered if no objection is made." *Id.* "In fact, all probative evidence received without objection in a contested case must be considered in administrative hearings."

*Id.* at 196. Section 536.070(8), RSMo 2000,[6] provides that "[a]ny evidence received without objection which has probative value shall be considered by the agency along with the other evidence in the case." Thus, "hearsay evidence admitted without objection may be utilized as substantial and competent evidence to support an administrative agency's finding." *Animal Shelter League of Ozarks, Inc. v. Christian County Bd. of Adjustment*, 995 S.W.2d 533, 541 (Mo.App.1999). When any admissibility issue is waived by failure to object, the issue cannot be raised subsequently by arguing the lack of sufficiency of the evidence to support a decision. *See Concord*, 916 S.W.2d at 196.

It is true, as KCPL and the Commission argue, that while hearsay evidence received without objection may be used to support an agency's decision, the Commission does not have to accept it as persuasive evidence. *Id.* Indeed, "[e]valuation of expert testimony is left to the Commission which 'may adopt or reject any or all of any witnesses' [sic] testimony.'" *Associated Natural Gas*, 37 S.W.3d at 294 (quoting *State ex rel. Associated Natural Gas Co. v. Pub. Serv. Comm'n*, 706 S.W.2d 870, 880 (Mo.App.1985)). When the Commission decides, in a proper exercise of its discretion, whether to adopt or reject an expert's testimony, this court will not second-guess that decision. *Id.*

While this court is not permitted to "substitute its discretion for discretion legally vested in an administrative agency," this court "does determine whether the agency exercised its discre-

---

**4.** Mr. Lewonski's affidavit concerned only the reliability of KCPL's service to GST before the Hawthorn 5 explosion.

**5.** The Commission's own regulation, 4 CSR 240–2.130(7)(A), specifically defines "direct testimony" as including "all testimony and

exhibits asserting and explaining that party's entire case-in-chief[.]"

**6.** All statutory references are to the Revised Statutes of Missouri 2000.

tion lawfully." *Mo. Nat'l Educ. Ass'n v. Mo. State Bd. of Educ.*, 34 S.W.3d 266, 280 (Mo.App.2000). In this case, the Commission's decision to accord Mr. Ward's opinion testimony "little weight" was not based on a proper exercise of its discretion. Instead, it was based on an erroneous interpretation of the law. In particular, it was based on the Commission's incorrectly finding that KCPL objected to all of the statements and documents attached to Mr. Ward's testimony and that the regulatory law judge had limited the purpose for which they were received. Aside from Mr. Lewonski's affidavit, the other statements and documents attached to Mr. Ward's testimony, which he relied upon in reaching his opinion, were received without objection by the regulatory law judge. Although hearsay,[7] the attachments had probative value, as they included plant records and statements from KCPL employees describing the events at the plant that led up to the Hawthorn 5 explosion. The facts contained in these attachments were substantive evidence in the record supporting Mr. Ward's opinion testimony. The Commission erred in concluding otherwise.

While the Commission certainly had the discretion to accord Mr. Ward's testimony and the attachments to his testimony "little weight," its decision to do so was based upon its erroneous interpretation of the law and, therefore, constituted an unlawful decision. The Commission's decision is reversed, and the cause is remanded to the Commission to reconsider Mr. Ward's testimony and the attachments to his testimony that were admitted without objection, under the proper standard. GST's first point is granted.

## Commission Erred in Failing to Make Findings on All Issues

In its second point, GST argues that the Commission erred in failing to address, in its Report and Order, one of two principal examples of KCPL imprudence identified by GST's expert, Mr. Ward. Specifically, GST contends that while the Commission discussed and rejected Mr. Ward's theory that KCPL should have placed a hold on the sump pump to prevent the flooding, the Commission did not address Mr. Ward's theory that KCPL should have responded to the flooding by placing a hold on the gas valves while the Burner Management System was under repair. Thus, GST argues that the Commission acted arbitrarily and capriciously by failing to make a finding on this theory of imprudence asserted by GST.

 Section 536.090 requires the Commission to make findings of fact and conclusions of law in a contested case. "Whether such findings and conclusions are sufficient is an issue of law for the independent judgment of this court." *Deaconess Manor Ass'n v. Pub. Serv. Comm'n*, 994 S.W.2d 602, 612 (Mo.App. 1999). The Commission's findings "must be sufficiently specific to enable the re-

---

7. As an alternative argument, GST contends that the statements of the KCPL employees constituted admissions against interest, an exception to the hearsay rule. "Admissions against interest made by an employee are admissible against the employer if the admissions are made in the scope of the employee's duties and the employee has some executive capacity." *Warrenton Campus Shopping Ctr., Inc. v. Adolphus,* 787 S.W.2d 852, 854 (Mo. App.1990). The scope of authority necessary for this exception is where the employer has created "an appearance of power in the employee such that third parties reasonably believe the employee can communicate for the employer." *Id.* Because the issues before this court are resolved on other grounds, it is not necessary to examine the record to determine if it includes evidence that any of the KCPL employees, upon whose statements Mr. Ward relied, had this kind of authority or executive capacity.

viewing court to assess the agency decision intelligently, and to ascertain whether the facts furnish a reasonable basis for the decision, without resorting to the evidence." *Cummings v. Mischeaux,* 960 S.W.2d 560, 563 (Mo.App.1998). While the Commission does not need to address all of the evidence presented, the reviewing court must not be "left 'to speculate as to what part of the evidence the court found true or was rejected.' " *Id.* (citations omitted). In particular, the findings of fact must be sufficiently specific to perform the following functions:

[F]indings of fact must constitute a factual resolution of the matters in contest before the commission; must advise the parties and the circuit court of the factual basis upon which the commission reached its conclusion and order; must provide a basis for the circuit court to perform its limited function in reviewing administrative agency decisions; [and] must show how the controlling issues have been decided[.]

*St. Louis County v. State Tax Comm'n,* 515 S.W.2d 446, 448 (Mo.1974) (citing *Iron County v. State Tax Comm'n,* 480 S.W.2d 65 (Mo.1972)). When the agency's order indicates that the agency completely failed "to consider an important aspect or factor of the issue before it," this court may find that the agency acted arbitrarily and capriciously. *Barry Serv. Agency Co. v. Manning,* 891 S.W.2d 882, 892 (Mo.App. 1995).

 The Commission stated in its Report and Order that it considered the positions and arguments of all the parties in making its decision, and that its "[f]ailure to specifically address a piece of evidence, position or argument of any party does not indicate that the Commission has failed to consider relevant evidence, but indicates rather that the omitted material was not dispositive of this decision." The omitted material in this case was evidence GST offered that KCPL should have placed a hold on the gas valves after the flooding caused the Burner Management System to malfunction. This evidence, if accepted, could have formed the basis for a finding that KCPL acted imprudently in how it responded to the flooding, even though the Commission concluded that there was insufficient evidence that KCPL acted imprudently in causing the flooding. Failing to place a hold on the sump pump to prevent the flooding and failing to place a hold on the gas valves to prevent the flow of gas into the boiler were two independent acts of imprudence asserted by GST. A determination that GST failed to prove that one of these alleged acts constituted imprudence did not resolve whether GST proved the other. Thus, whether KCPL was imprudent for failing to place a hold on the gas valves after the flooding was a dispositive issue in the case.

KCPL and the Commission argue that because the evidence of KCPL's potential imprudence for failing to place a hold on the gas valves after the flooding came from Mr. Ward, the Commission did not find it credible and chose to reject it. There is no indication of this in the Commission's Report and Order. Moreover, if the Commission chose to reject Mr. Ward's testimony as to KCPL's potential imprudence for failing to place a hold on the gas valves on the same basis that it rejected his testimony as to KCPL's potential imprudence for failing to place a hold on the sump pump, i.e., that his testimony was unsupported by substantive evidence, then the Commission's decision to do so was based on an erroneous interpretation of the law.

In any event, the Commission's failure to address the issue of whether KCPL should have placed a hold on the gas valves after the flooding caused the Burn-

er Management System to malfunction and its failure to do so triggered the Hawthorn 5 explosion precludes this court from being able to adequately assess the Commission's conclusion that GST failed to show that KCPL's imprudence caused the Hawthorn 5 explosion. Because this court is remanding for the Commission to reconsider Mr. Ward's testimony as to KCPL's alleged imprudence in responding to the flooding, the Commission should, on remand, make findings on this evidence. GST's second point is granted.

### GST Had Burden of Proof

■ In its third point, GST argues that the Commission erred by placing the burden on GST to prove KCPL's imprudence. GST initiated this case under section 386.390.1. This section provides, in pertinent part:

> Complaint may be made by ... any corporation ... by petition or complaint in writing, setting forth any act or thing done or omitted to be done by any corporation, person or public utility, including any rule, regulation or charge heretofore established or fixed by or for any corporation, person or public utility, in violation, or claimed to be in violation, of any provision of law, or of any rule or order or decision of the commission[.]

In its claim that is the subject of this appeal, GST alleged that KCPL's imprudence caused the Hawthorn 5 explosion, which in turn resulted in KCPL's providing inadequate and unreliable service to GST and charging GST unjust and unrea-

sonable rates, in violation of section 393.130.1.[8] In cases where "a complainant alleges that a regulated utility is violating the law, its own tariff, or is otherwise engaging in unjust or unreasonable actions," the Commission has determined that "the burden of proof at hearing rests with complainant." *Margulis v. Union Elec. Co.,* 30 Mo. P.S.C. (N.S.) 517, 523, 1991 WL 639117 (1991). This court has affirmed placing the burden of proof on the complainant in such cases, because the burden of proof properly rests on the party asserting the affirmative of an issue. *State ex rel. Tel–Central of Jefferson City, Inc. v. Pub. Serv. Comm'n,* 806 S.W.2d 432, 435 (Mo.App.1991). Applying this principle, because GST was asserting the affirmative on the issue of KCPL's imprudence, the burden of proof rested on GST.

■ Nevertheless, GST argues that a case from this court, *State ex rel. Associated Natural Gas Co. v. Public Service Commission,* 954 S.W.2d 520 (Mo.App. 1997), required the burden of proof to be on KCPL to prove it acted prudently. In *Associated Natural Gas,* a utility initiated a proceeding before the Commission to recover from its customers certain costs it incurred in obtaining gas from its suppliers. *Id.* at 522–23. In such a proceeding, the Commission reviews the reasonableness of the costs and, if it determines that the costs have been appropriately incurred, the Commission allows the utility to pass the costs on to its customers. *Id.* at 523. To determine whether the costs were appropriately incurred, the Commis-

---

**8.** Section 393.130.1 provides, in pertinent part:

[E]very electrical corporation ... shall furnish and provide such service instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable. All charges made or demanded by any such ... electrical corporation ... for ... electricity ... rendered or to be rendered shall be just and reasonable and not more than allowed by law or by order or decision of the commission. Every unjust or unreasonable charge made or demanded for ... electricity ... or any such service, or in connection therewith, or in excess of that allowed by law or by order or decision of the commission is prohibited.

sion uses a prudence standard. *Id.* Under the prudence standard, the Commission looks at whether the utility's conduct was reasonable at the time, under all of the circumstances. *Id.* at 529. In applying this standard, the Commission presumes that the utility's costs were prudently incurred. *Id.* at 528. Where, however, another participant in the proceeding before the Commission " 'creates a serious doubt as to the prudence of an expenditure, then the [utility] has the burden of dispelling these doubts and proving the questioned expenditure to have been prudent.' " *Id.* (citations omitted). Relying on this language from *Associated Natural Gas,* GST contends that the mere fact that the Hawthorn 5 explosion case occurred created a "serious doubt" as to the prudence of KCPL's actions; therefore, KCPL should have had the burden of proving that its actions with regard to Hawthorn 5 were prudent.

*Associated Natural Gas* is sufficiently substantively and procedurally dissimilar, however, to make it inapplicable to this case. *Associated Natural Gas* was a ratemaking case initiated by the utility, seeking to pass on costs to its customers. *Id.* at 523. In such cases, the utility receives the benefit of the presumption of prudence with regard to its costs until a serious doubt is created with regard to the prudence of an expenditure. *Id.* at 528. When a serious doubt arises, the burden then shifts to the utility to prove prudence of the expenditure in order to succeed on its request to pass these costs on to its customers. *Id.*

In this case, KCPL did not initiate this action to increase its rates, thereby putting the prudence of its expenditures at issue. Rather, GST initiated this complaint seeking a determination that KCPL's imprudent actions caused an explosion at one of the utility's generating units which, in turn, resulted in KCPL's providing inadequate and unreliable service and charging GST unjust and unreasonable rates. GST put KCPL's imprudence at issue, therefore, under *Tel–Central,* and *Margulis* it should have the burden of proving that issue.

As an alternative argument in this point, GST argues that the burden of proof shifted to KCPL to prove its prudence because GST created a rebuttable presumption of KCPL's imprudence under the doctrine of res ipsa loquitur. GST notes that in its Report and Order, the Commission equated imprudence with simple negligence, and defined it as the " 'failure to use such care as a reasonably prudent and careful person would use under similar circumstances[.]' " (Citation omitted.) GST argues that because the Commission "held that common-law negligence principles govern," the Commission should have applied the doctrine of res ipsa loquitur. GST contends that since it met the requirements for application of the doctrine of res ipsa loquitur,[9] a rebuttable presumption arose that KCPL acted imprudently and, therefore, KCPL bore the burden of overcoming that presumption by proving that it acted prudently.

The doctrine of res ipsa loquitur is "a rule of evidence that permits a jury to infer from circumstantial evidence that the defendant is negligent without requiring that the plaintiff prove defendant's specific negligence." *Weaks v.*

---

9. To apply the doctrine of *res ipsa loquitur,* the plaintiff must prove: " '(1) the incident resulting in injury is of the kind which ordinarily does not occur without someone's negligence; (2) the incident is caused by an instrumentality under the control of the defendant; and (3) the defendant has superior knowledge about the cause of the incident.' " *Weaks v. Rupp,* 966 S.W.2d 387, 393–94 (Mo. App.1998) (citation omitted).

*Rupp,* 966 S.W.2d 387, 393 (Mo.App.1998). The making of a submissible case under res ipsa loquitur creates only a permissible, rebuttable inference of negligence. *Id.* at 396. The defendant is not required to introduce evidence to rebut the inference of negligence, and the trier of fact is free to accept or reject the inference, even if the defendant introduces no contrary evidence. *Id.* The burden of proving liability remains, at all times, with the plaintiff. *Id.*

■ GST cites no authority for its proposition that a complainant in a Public Service Commission case can rely on the doctrine of res ipsa loquitur to meet its burden of proving a utility was imprudent and this imprudence resulted in inadequate and unreliable service and unjust and unreasonable rates. Even if res ipsa loquitur were available in this case and GST met the requirements for its application, however, the doctrine would create only an inference, and not a rebuttable presumption, as GST contends. GST would still bear the burden of proof, and the Commission, as the trier of fact, would be free to reject any inference of negligence regardless of whether KCPL presented any evidence to the contrary.

GST, as the complainant asserting the affirmative issue of KCPL's imprudence, bore the initial burden of proof in this case, and the burden of proof never shifted. GST could meet its burden of proving imprudence through direct evidence or reasonable inferences drawn from the evidence. Merely creating a reasonable inference of imprudence would not conclusively establish imprudence, as the Commission is free to reject any inferences. Nor would a reasonable inference of imprudence create a rebuttable presumption of imprudence, thereby shifting the burden of proof to KCPL to prove its prudence. The Commission did not err in

placing the burden of proof on GST. GST's third point is denied.

### Commission Had No Power to Determine Insurance Proceeds Issue

In its fourth point, GST argues that the Commission erred in failing to address its claim that, regardless of whether KCPL acted imprudently, KCPL was required to consider monies it received from its insurers for the cost of purchasing replacement power in calculating the rate to be charged GST under the special contract. GST points out that it presented expert testimony from Steven C. Carver, a utility operations and ratemaking consultant, that KCPL recovered $5 million in insurance proceeds for replacement-power coverage under an "extra expense" endorsement to its property policies. In Mr. Carver's opinion, since GST, as a ratepayer, had paid for this insurance coverage, GST should receive the benefit of any recovery under that coverage. Specifically, Mr. Carver testified that because KCPL received the insurance proceeds to cover the increased cost of replacement power after the Hawthorn 5 explosion, KCPL should use the insurance proceeds to offset the increases in the cost of replacement power in calculating the variable cost component of GST's rate under the special contract. GST argues that the Commission did not mention this claim in its Report and Order and, therefore, failed "to consider an important aspect or factor of the issue before it." *Barry Serv. Agency,* 891 S.W.2d at 892.

Contrary to GST's argument, the Commission did, in fact, address this issue. In the section of its Report and Order entitled, "Jurisdiction to Provide a Remedy," the Commission discussed the parameters of its authority to afford relief in this case, and determined that it could not provide

the relief GST was seeking. Specifically, the Commission determined that it could not "direct KCPL to recalculate its charges to GST for electrical service already rendered, or to be rendered, as though some portion of that electricity had been generated by Hawthorn 5 at a lower cost," because to do so would constitute a form of equitable relief. The Commission further concluded that it could not "direct KCPL to recalculate its charges to GST for electrical service already rendered, or to be rendered, using insurance proceeds received with respect to the Hawthorn 5 explosion to reduce the cost of replacement power." These statements indicate that the Commission determined that it was without power to adjudicate GST's claim that KCPL was required to consider insurance proceeds it received for the cost of purchasing replacement power when calculating GST's rate.

◼ Prior case law supports the Commission's conclusions. As a creature of statute, the Commission has only those powers conferred either expressly or implicitly by statute as necessary to carry out the specifically-granted powers. *State ex rel. Utility Consumers' Council of Mo., Inc. v. Pub. Serv. Comm'n,* 585 S.W.2d 41, 49 (Mo. banc 1979). Among the authority the Commission possesses is the power to determine the proper rate classification applicable to a utility customer for services rendered and to be rendered. *State ex rel. Kansas City Power & Light Co. v. Buzard,* 350 Mo. 763, 168 S.W.2d 1044, 1047–48 (Mo. banc 1943). If the Commission determines that the customer was improperly classified for services already rendered, the customer may then seek a remedy in the circuit court to recover the excess

amount charged under the improper classification. *Id.* While the "Commission does have exclusive jurisdiction of all utility rates," "when a controversy arises over the construction of a contract or of a rate schedule upon which a contract is based, and a claim of an overcharge is made, only the courts can require an accounting or render a judgment for the overcharge." *Wilshire Constr. Co. v. Union Elec. Co.,* 463 S.W.2d 903, 905 (Mo.1971). This is so because the Commission "cannot 'enforce, construe nor annul' contracts, nor can it enter a money judgment." *Id.* (quoting *May Dep't Stores Co. v. Union Elec. Light & Power Co.,* 341 Mo. 299, 107 S.W.2d 41, 49 (Mo.1937)). Likewise, the Commission does not have the authority to do equity or grant equitable relief. *Am. Petroleum Exch. v. Pub. Serv. Comm'n,* 172 S.W.2d 952, 955 (Mo.1943).

◼ In this case, GST is essentially asking the Commission to adjudicate its claim that it was overcharged under the special contract because the cost of replacement power, a factor in the variable cost component of GST's rate under the special contract, should be KCPL's actual costs, offset by any insurance recoveries. The Commission has no authority to do so. *Wilshire Constr. Co.,* 463 S.W.2d at 905. The Report and Order fully resolved this issue. GST's fourth point is denied.

## Conclusion

That portion of the judgment of the circuit court affirming the Commission's decision that the charges of KCPL to GST were at all times just and reasonable and that GST was not overcharged is reversed.[10] The cause is remanded with directions to reverse the Commission's deci-

---

10. As this court has already discussed with regard to the insurance proceeds issue, the Commission has no power to decide whether GST has been "overcharged" under the spe-

cial contract. *Wilshire Constr. Co.,* 463 S.W.2d at 905. Thus, the Commission's determination that GST was not "overcharged" under the special contract as a result of

sion and remand to the Commission to reconsider the expert's testimony, including the attachments to the testimony that were admitted without objection, and make findings on GST's theory that KCPL was imprudent in how it responded to the flooding determine whether the charges to GST were just and reasonable at all times. Since the Commission did not err in placing the burden of proof on GST to prove KCPL's imprudence, nor did the Commission err in determining that it was without power to determine whether KCPL should use insurance proceeds to offset the cost of replacement power in calculating GST's rate under KCPL and GST's special contract, the portion of the circuit court judgment affirming these actions by the Commission is affirmed.

The judgment affirming the Commission's Report and Order is affirmed, in part, and reversed, in part, and remanded.

All concur.

---

KCPL's alleged imprudence is, in and of itself, erroneous. The proper issue before the Commission is not whether GST was "overcharged," but, rather, whether KCPL's charges to GST were just and reasonable at all times in light of GST's allegations of imprudence.